The second case of the day, United States v. King et al. The first case of the day, United States v. King et al. The second Turning now, Your Honors, to the sentencing issue, I would like to direct the Court's attention to page RSA 43 in Mr. Martin's opening brief. This is the Court explaining its opposite factual ruling at Mr. Martin's sentencing on the Brian Smith issue. The Court says, But what I've realized is, of course, none of these, there isn't a single murder that makes sense from a logical point of view. Further down, Ms. Kendall, why would that, let's assume that's error. Let's assume it's a clear error in her factual finding. Let's put that to the side. Since his guidelines range would have been the same, why wouldn't it be harmless? Your Honors, because the District Court then sentenced Mr. Martin below the guidelines range, which shows that the Court was leaning towards lenience towards Mr. Martin. And because the District Court did not unequivocally say, on the record, that it would have sentenced Mr. Martin to the same time, regardless of this Brian Smith issue, the Court cannot find that this is harmless error. There's nothing in the record showing that Mr. Martin would have gotten the same sentence from the District Court, regardless of this offense grouping. But she said she would have taken into account in 3553. Yes, Your Honor, but under this Court's holdings in United States v. Heinz-Flagg and United States v. Foster, this Court requires a clear, unequivocal statement by the District Court that the Court would have given the same sentence, regardless of the factual finding. So the Court does not talk about the length of the sentence in discussing 3553A generally. Also, Your Honors, the District Court made this opposite factual finding in Mr. Martin's sentencing, looking at the same exact factual record as Mr. King's sentencing. There was a joint trial with Martin and King. The District Court then held a joint hearing for Martin and King on this issue and issued identical rulings about whether that Brian Smith issue was in furtherance of the conspiracy. It said that the Court had looked at everything, looked at that identical factual record, and found that it was not in furtherance of the conspiracy. The Court then sentenced Mr. King pursuant to that finding, and as she said here, after looking at it over and over and realizing that it actually didn't make sense, that it was illogical, suddenly now it was in furtherance of the conspiracy. Your Honors, the absence of logic cannot be the factual nexus showing that an act is in furtherance of a RICO conspiracy. The District Court did not point to, nor could have pointed to, any new evidence before it at Mr. Martin's sentencing versus Mr. King's sentencing. It also does not matter that Mr. Martin and Mr. King played different roles in this attempted murder because the only question before the District Court was whether this plan was in furtherance of the conspiracy. So the government notes that the Court cited several phone calls involving Mr. Martin in this attempted murder plan. But the fact that Mr. Martin played one role while Mr. King played another role does not matter because this is not a leadership enhancement, Your Honors, that would be specific to Martin or King. The same facts that apply to Martin apply to King because this is a RICO conspiracy. So we are attributing all co-conspirators' acts to each other. The only question is, was this in furtherance of the conspiracy? And the District Court's explanation for making a complete 180 on this issue is wholly unjustified. Moreover, Your Honors, as I mentioned, this was not harmless error because there is nothing unequivocal in the record showing that the District Court would have given Mr. Martin the same sentence regardless of this Brian Smith factual finding. If there are no further questions, Your Honor, I would like to reserve my time. The Court considered Mr. Martin a leader, right? The Court did consider him in the upper level of the hierarchy, Your Honor, yes. But that is irrelevant for this factual finding because it's just whether this plan as a whole, allegedly committed by all the co-conspirators, was in furtherance of the conspiracy. So this was not a leadership enhancement, simply a factual finding that ended up creating a new offense grouping for Mr. Martin. Thank you, Your Honors. Are you reserving some time for rebuttal? Yes, please. Thank you, Ms. Gallagher. Mr. Green. May it please the Court, Government, fellow appellants. Judge, I'm Jay Clifford Green. I represent Mr. Hoskins in the District Court. Judge, because the Government withheld 500 pages of law enforcement documents that were garnered and taken from an individual between 2004 and 2010, these defendants, and they weren't turned over until after trial, the defendants, Judge, did not get a fair trial. If we'd had those documents, a number of things would have happened in our favor. First off, Judge, we could have called the authors of those reports and gotten them to support our theory of this defense, which in part was that there was no enterprise here. Those reports, we could have crossed those agents. We could have talked to those agents and got them to say that there was no enterprise here. And if they disagreed with the reports, of course, that would have been impeaching. If they'd agreed with it, of course, the written reports, then of course that would have supported our defense. We didn't have those documents. We couldn't go down that road. And when I say 500 pages from interviews that occurred over that period of time, those six years, it wasn't just any old informant. This informant was a man by the name of Matthew Williams, D.J. D.J. was the former king, the head guy in the double and same vice lords. Now suppose, you know, think about it like this is how I think about it. Think about it like this. If I'd had that material, there were two motions that we filed. At least two motions we filed pre-trial. One of them was a motion to suppress the wiretaps. I filed that motion. Martin's attorney filed that motion. Part of my argument with Magistrate Cole was there's no need for the wiretap here, Judge. Magistrate Cole, there's no need for it because the government had CW1, according to the affidavits and application. They had CW2. These two individuals had 20 and 25 years' worth of corporate knowledge as to the in-workings of the double Is. If I'd had these other materials, the D.J. materials that the government suppressed, I could have said there's 75 years' worth of corporate knowledge as to the inner workings of the double Is. Seventy-five years. There's definitely no need for a wiretap here. Judge, I can't express how disheartening it was to watch Agent Marquez, who Mr. Loud at one point called Super Agent, Super Investigator, because he had a wide, deep set of experiences in law enforcement in the Chicagoland area. He sat up there, and I witnessed that, and he was so smug when I cross-examined him, and he was so smug because he actually told me that he had seen pretty much every document in this case. He had seen the law enforcement reports from 2004 to 2010 that I didn't see. I couldn't cross-examine him on the things that those reports indicated. D.J. in those reports told law enforcement that the double Is, here's where you can find drugs. Here's where you're going to see shootings. The controlled buys over here gave away the whole store. As a result of that, between 2004 and 2010, there was tremendous distrust among the members, tremendous disorganization. It fell apart. Come 2010, what happens? 2010, D.J. dies. The leader of the double Is died. 2010, Joe Faulkner, who was running the day-to-day operations for that gang, was shot and imprisoned. There was nobody at the helm at that point. Not only did D.J. dismantle the group between 2004 and 2010, but when he died and Joe Faulkner, the lead guy running things on the streets in Chicago, was shot and incarcerated, nobody was at the top. It further went down. At that point, what you actually had, you had a desperate group of individuals, crabs in a bucket, scratching their way, literally killing each other over table scraps. We'd had all that information. We certainly could have convinced the district court that there was no enterprise here. There was no enterprise here. There was no enterprise here. That information alone would have colored this case differently. So under Brady, we think that those reports would have allowed us to... They certainly would have been favorable. They also would have allowed us to impeach, and they were certainly material because they would have clearly caused a different result in this case or at least a reasonable possibility that the results would have been colored differently. The verdict would have been doubtful. And so for these reasons, we pray that you see the wisdom in reversing the district court and for whatever relief you deem is appropriate. Thank you, sir. Thank you. Mr. Jameson. Good morning. May it please the court, Jim Jameson, appearing for Mr. Torrey King. And at the risk of being accused of lecturing the professor, which I don't want to do, I'll point out the United States v. Ballard decision that you, Judge, Judge Baum, wrote. And the court issued seven days after we filed our opening brief in this matter. The government references it. And building on Mr. Green's statement, just want to make five quick points just so that we're all on the same playing field here. And Judge Baum authored, and the decision reads, number one, Brady violations often implicate both issues of fact and law. And this court then reviews the district court's factual findings for clear error and legal conclusions de novo. So what's the court going to do? The court must examine the trial record, evaluate the withheld evidence in the context of the entire record, determine in light of that examination whether there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. And as Judge aptly put it, whether evidence is favorable in material is, quote, legally simple but factually complex. In order to have a reasonable probability of a different result, again, this is Ballard, we're on page 505, the suppressed evidence must undermine confidence in the outcome of the trial. Regarding favorability, evidence need only have some weight or tendency to be favorable to the defendant. And finally, it's true that it's a rare case, I'm quoting now from page 505, the rare case in which impeaching evidence warrants a new trial, because ordinarily such evidence will cast doubt at most on the testimony of one of the witnesses. And my argument today to this court, to this honorable court, is that this is not that case. And as Mr. Green very succinctly put it, the D.J. disclosures that the court never reviewed in their entirety took a look at a summary and issued a very cursory, without any substantiation, judgments as to whether it was material, immaterial, whether it was favorable, unfavorable. These disclosures, timely made, would have gone to, I mean, there are myriad issues dealing with trial tactics, with the law, with the facts. The whole proceeding would have been different if this evidence would have been turned over at the time it should have been turned over. And thank you. Thank you, Mr. Jameson. Mr. Loud. Thank you, and may it please the court, Raj Loud on behalf of the United States. I want to start on this question of the materials relating to the deceased confidential informant. It's not a Brady violation because those materials were irrelevant and it had no impact on the outcome of the trial. The most important way, there's two reasons why they really have no bearing on the trial. The first is time. All of the examples cited in the detailed motions filed below are essentially from the time period of 2005 through 2007. The time period that the government's evidence focused on at trial, and the time period of all the RICO predicates alleged in the indictment was 2010 and 2011. And it's the same reason why it's not relevant to the necessity for the wiretaps. An informant who is no longer alive could not provide information about the activities, ongoing activities of the Imperial Insane Vice Lords. The other key reason this information is irrelevant but also immaterial is hearsay. So counsel this morning argued that he would have called the report authors to testify about the contents of the report. That would have not been admissible evidence. That would have been hearsay. In addition, there was evidence presented at trial that there were internal disputes within the Imperial Insane Vice Lords at the relevant time period, the time period of the events at the trial through the recorded conversations, through examination and cross-examination of the government's cooperating witnesses. So the defense had the opportunity to make that argument. It's simply not a winning argument because there was ample evidence of structure of the gang. They had a name. They had territory. They had ranks and positions. And the court was presented with evidence of the individuals involved in the gang using those positions to accomplish the purpose of the gang, which was to control certain territory and sell drugs there. I want to clear up some confusion with regard to the Confrontation Clause issue raised by Mr. Martin. First of all, this was a bench trial, so it's not a brutal issue. The only way that there could be a Confrontation Clause error here is a Lee v. Illinois situation where the district court expressly used another defendant's post-arrest statement against a defendant. That absolutely did not happen here. A couple of things I think in the argument you just heard may have caused some confusion, so I want to clear them up. The first is this reference to both of them in the district court's opinion, oral ruling at the bench trial. Now, the district court was rendering a verdict as to Mr. Martin and Mr. King. Mr. Hoskins was not charged in Count 6 of the indictment. Count 6, the harboring count, was against Julian Martin and Tori King. Mr. Hoskins was instead charged with conspiracy to commit murder for ordering that act of violence. And then later the district court in her oral ruling clarified that she understood that Mr. King was not in the car, and that was a misunderstanding. The evidence that Mr. Martin knew what was going on came from several sources. There are a number of recorded telephone calls about this incident, and many of them discuss the practicalities, the logistics of the harboring, where they're going to put Mr. Brown, what he's doing to change his appearance. But they also reveal that Mr. Martin was aware that the police were looking for Mr. Brown, and because of his rank in the gang and because of all the communication among the co-conspirators, it really would defy common sense that Mr. Martin didn't know the purpose of that harboring. They put Mr. Brown, the murderer, up in a hotel outside of the city of Chicago, kept him there. He cut his dreadlocks, which were distinctive. He tattooed over a teardrop he had on his eye. That's why his nickname was Teardrop Thuggish, with a star to conceal his appearance. This was because he was wanted for a very serious crime. And the district court did reference the fact that Mr. Martin was with Mr. Hoskins, Mr. Brown, and Mr. Hawthorne after the shooting. That was supported by the officer's testimony. The first officer to testify said he was able to see Mr. Martin driving his car, and then the other officer responded to conduct a traffic stop or investigatory detention. By that time, the car was stopped. Mr. Martin had stepped outside of the car, and the other three individuals were still seated inside. So it clearly supports the inference and the conclusion reached by the district court that all four of them had been together in the car. And simply referencing that evidence falls far short of expressly relying on Mr. Hoskins' post-arrest statement. On the district court's factual finding at Mr. Martin's sentencing, I think it is important to remember that this had no impact on the advisory guideline range, and that there was no dispute that the district court's finding at trial, actually, the court made a point of saying beyond a reasonable doubt, even though she was acquitting Martin and King, that they had conspired to murder an individual that night. The district court's concern set forth in her oral ruling at trial was that the murder seemed senseless to her. The target, Brian Smith, was a former member or retired member of the Four Corner Hustlers, the rival gang, and was close to the leader of the rival gang with which the Imperial and St. Vice Lords were at war, but was also friendly with members of the Imperial and St. Vice Lords. That was his testimony. And the district court found the fact that the Imperial and St. Vice Lords would target him to be senseless. And after more time to analyze the recorded calls, more time to realize the significance of the government's evidence on this point, which includes things like Mr. Martin telling an imprisoned member of the Imperial and St. Vice Lords at this time that it was on to popping, to paraphrase that they were in a shooting war with the Four Corner Hustlers. Keep in mind this happened just days after the murder of Marcus Hurley by Andre Brown, and at the same time they're plotting the murder of Brian Smith. Also discussing with another member of the Imperial and St. Vice Lords, after the would-be shooter in the Brian Smith conspiracy was arrested by police, that he had been arrested over something we had set up. We was the word that Mr. Martin used, the interpretation being the Imperial and St. Vice Lords, and that it was foolish because it was something that never actually succeeded. So all of that evidence supports the district court's conclusion that this murder plot was in furtherance of the racketeering activity. The district court frankly admitted that she weighed that evidence differently at Mr. King's sentencing and believed her earlier conclusion to be erroneous. I submit that there's no value to be served in persisting in an erroneous conclusion. The government didn't appeal Mr. King's sentence, and it was the government that was injured by that error. It doesn't preclude the district court from reaching a contrary finding here. And then finally, under 3553A, obviously the most significant thing about this is that it was a plot to kill another human being. Whether it was technically in furtherance of the racketeering enterprise or not, there's absolutely no reason to think it would have a difference in the sentence imposed by the district court, particularly when the district court said that it would consider it either way. Frankly, I think it's possibly even more aggravating if it's not in furtherance of the RICO enterprise and just some random additional murder plot that the defendant would have been involved in. If there are no questions on the remaining issues, I'll rest on the brief. Thank you, sir. Thank you. Ms. Gellar. Thank you, Your Honors. First, on the Confrontation Clause issue, Your Honors, responding to the government's point about there being evidence of Mr. Martin's rank and his alleged evidence of harboring Mr. Brown, none of those show, Your Honors, that Martin knew Brown murdered Hurley. They potentially show that Martin knew something was amok and that something bad had happened, but they do not show knowledge of murder committed by Brown. That evidence went to the harboring elements of Count 6, Your Honors. Turning to the Brian Smith issue, Your Honors, the government points out how the district court had just had more time to think about this and look at the briefing, but the timing of a defendant's sentencing cannot dictate the factual findings that a district court makes. It is blatantly unfair and substantively unreasonable. All of the evidence cited by the government showing that this purported attempted murder was in furtherance of the conspiracy was already before the district court at the joint trial. It was before the district court at the joint hearing when the government presented that same evidence to the district court, and it was presented to district court in briefing on this issue. The district court, in finding that it was not in furtherance of the conspiracy after that hearing, said that it had looked at all of the evidence that the government had presented. The court specifically said it had looked at this evidence, and for the court to change its mind with no reason given whatsoever except for the fact that this is illogical is wholly insufficient, Your Honors. Therefore, we ask for a new trial on Counts 1, 6, and 9 and a new sentencing on the remaining counts, Your Honors. Thank you. Mr. Green. Certainly, we could have crossed the agents on the DJ material if they testified otherwise. We could have done that. Mr. Loud mentions the fact that the materials are hearsay, not admissible, but under the Morales cases we cited, it doesn't have to be admissible in its face to constitute a Brady violation under Morales. If that evidence was material and exculpatory, due process, says that if it leads to other evidence that's reasonable to affect the outcome of the trial, then we can certainly go there. The government also mentioned something about the time, 2010-2011. They charged a large-scale RICO conspiracy involving numerous individuals. They interviewed Mr. DJ Matthew Williams for six years. Certainly, that is material that we should have had that we could have used to defend this case, and by virtue of the fact that they hid that from us until after trial, smacks of a Brady violation. We asked the court so fine. Thank you, Mr. Green. Mr. Jamison. Very quickly, Your Honor. Thank you. I would just like to bring the court's attention or remind the court of a case we cited in our brief. It's United States v. Flores Rivera. It's out of the First Circuit Court of Appeals. It goes to the issues of whether this was cumulative, whether it had any kind of bearing, and in that case, the First Circuit said, in looking at the decision, all right, they believed evidence that it heard, but what would have happened if it heard evidence that it didn't hear? It begs the question whether the outcome would have been the same if they had also heard the omitted impeachment evidence. I think we were barred from doing that. We were barred from bringing in that evidence at all. Second, and this goes to the cumulative nature, First Circuit said the fact that the defense had some tools dismisses the potential of different tools, saying somehow that's merely cumulative, and I think the fact that we didn't have those tools at our disposal is a fundamental fairness violation. Thank you. Thank you, Mr. Jamison. Our thanks to all counsel, and Ms. Gallo, Mr. Green, and Mr. Jamison, you have the additional thanks to the court for accepting the appointment and ably representing the defendants. Case is taken under advisement.